IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

CROWN WEST REALTY, LLC,              )
                                     )          No.  35610-8-III
                 Petitioner,         )
                                     )
        v.                           )
                                     )
POLLUTION CONTROL HEARINGS           )          PUBLISHED OPINION
BOARD,                               )
                                     )
                 Respondent,         )
        and                          )
                                     )
STATE OF WASHINGTON,                 )
DEPARTMENT OF ECOLOGY,               )
                                     )
                 Respondent.         )

FEARING, J. —

> *All the water that will ever be is, right now.*  National Geographic (Oct. 1993).

A writer generally employs an oxymoron as a literary device to create drama, reflection, or humor.  This appeal asks us to review the ostensible oxymoron "residential use for a nonresidential population."  RCW 90.03.015(4)(a).  Since the Washington State Legislature inserted the ostensive oxymoron into a statute, serious practical consequences, rather than stylish emanations, attend the phrase.  RCW 90.03.015(4)

defines "[m]unicipal water supply purposes," in part as "a beneficial use of water . . . [f]or providing *residential use of water for a nonresidential population* that is, on average, at least twenty-five people for at least sixty days a year."  (Emphasis added.)  The definition holds importance because Washington law does not subject the water right of a municipal water supplier to relinquishment for nonuse.

In this appeal, Crown West Realty, LLC (Crown West) challenges the Washington Pollution Control Hearings Board (Hearings Board) determination that its water system within the Spokane Business and Industrial Park (industrial park) does not qualify as a municipal water supplier.  A ruling to the converse would allow Crown West to benefit from inchoate water rights and permit the transfer of the rights to the Washington water trust program in order to allow others to extract water from streams.  We affirm the Hearings Board and deny Crown West's appeal.

## FACTS

This appeal concerns the Washington Department of Ecology's (Department of Ecology or Ecology) refusal to recognize that Crown West, the current owner of the industrial park, holds a water right for municipal water supply purposes.  Players in the appeal include administrative agencies Chelan County Water Conservancy Board (Water Conservancy Board or Conservancy Board) and the Hearings Board.  The Department of Ecology, the Conservancy Board, and the Hearings Board all play a role in classifying, assessing, and administering water rights.

Our facts begin seventy-seven years ago. In 1942, our county's first full year of combatancy in World War II, the United States Navy established a supply depot on the land now known and operated as the industrial park, located in Spokane Valley. In 1942, the Navy drilled three wells to supply the depot with water.

By 1945, one hundred and twenty-seven Navy personnel and Marines lived at the Spokane Valley Navy supply depot. Approximately 2,700 civilians worked at the depot full time. Buildings at the depot included an officers' quarters, barracks, a cafeteria, and a fire station with residential quarters. The depot applied the well water for potable uses, for gardens, and for steam heat.

The United States Navy operated the Spokane Valley depot until 1958. In this litigation, the Department of Ecology admits the Navy's use of the well water from 1942 to 1958 fulfills the definition of a "municipal water supply" under current Washington law. Administrative Record (AR) at 194.

In 1960, the United States Navy sold the Spokane Valley supply depot to Spokane Industrial Park, Inc. (the former park corporation or park corporation). Thereafter, the former park corporation transformed the supply depot into a business and industrial park. After the sale and until 1990, the industrial park's residential structures remained inhabited by park corporation personnel or renters.

In 1970, with Washington's adoption of new methods to claim and perfect water rights, the former park corporation filed, with the former Department of Water

Resources, three groundwater right claims for industrial and domestic use, one claim each for the respective wells. The park corporation claimed a priority in all rights as of December 1942. One claim asserted a right to 1,350 gallons per minute with a yearly total of 2,178 acre-feet per year (AFY), but recognized the park then used only 675 gallons per minute and 1,089 AFY. Another claim asserted a right to 750 gallons per minute with a yearly total of 1,208 AFY and stated that the park then used all of the gallonage and AFY claimed. The final claim avowed a prerogative to withdraw from a well 1,050 gallons per minute with a yearly total of 1,694 AFY and further stated that the park used all of this gallonage and AFY. The sum of the three claims totals 5,080 AFY. The Department of Water Resources assigned the numbers G3-001087CL, G3-001088CL, G3-001089CL to the three claims. At some unknown date, the Department of Ecology likely issued permits based on the claims.

Also, in 1970, the former park corporation filed with the Department of Ecology a request for three water certificates to append to the three claims. The application did not seek to add to the amount of AFY, but instead requested certificates totaling 5,080 AFY. The former park corporation sought these three certificates in order to protect the property's water rights in the event one or more of the earlier three claims, based on a priority date of 1942, failed. A water certificate gains a firmer legal standing than a water right claim predating the water codes. Nevertheless, the former park corporation's certificates would only enjoy a 1970 date of priority.

4

In 1971, the Department of Ecology issued the former park corporation three certificates of groundwater right, Nos. 7129-A, 7130-A, and 7131-A, covering the three wells. Each certificate read, in part: "Spokane Industrial Park, Inc., . . . has made proof to the satisfaction of the Department of Ecology of a right to the use of the public ground waters of the State of Washington" from the respective well. AR at 402, 404, 406. Each certificate noted the issuance of the earlier permit and that the former park corporation had perfected the right asserted under the permit. Each certificate also read that "this certificate of ground water right is specifically subject to relinquishment for nonuse of water as provided in RCW 90.14.150." AR 402, 404, 406. The certificates described the permitted use as "community domestic supply, manufacturing, and industrial use." AR at 402, 404, 406.

The former park corporation's 1971 groundwater right certificates matched the quantities stated in the earlier water right claims except that two certificates, Nos. 7129-A and 7130-A, recognized only half of the annual quantities as their analog water right claims. In other words, two of the certificates respectively claimed a right to 604 AFY and 1,090 AFY. The certificates read in legalese that the "quantity of ground water under the right hereby confirmed for aforesaid purposes, is limited to an amount actually beneficially used for said purposes, and shall not exceed" the stated amounts. AR 402, 404, 406.

A Department of Ecology report of examination for the 1971 issuances of the

former park corporation's water right certificates documented seventy-eight businesses, with an estimated 2,500 employees, operating in the industrial park in 1970. The report of examination also declared that the three wells, integrated into a common water system, served two homes, one office, and a half-acre of lawn. Well 3 operated twenty-four hours a day. The other two wells ran only as needed.

In 1973, the former park corporation applied, from the Department of Ecology, for an additional groundwater permit. The application sought to drill a fourth well to withdraw up to 2,600 gallons per minute and 4,227 AFY of water. Ecology issued the permit, under the number G3-22023C, but reduced the amount of the water right to 4,194 AFY. In 1976, the Department of Ecology issued Certificate No. G3-22023C for this water right. The certificate reads:

> This is to certify that the herein named applicant has made proof to the satisfaction of the Department of Ecology of a right to the use of the public waters of the State of Washington as herein defined, and under and specifically subject to the provisions contained in the Permit issued by the Department of Ecology, and that said right to the use of said waters *has been perfected* in accordance with the laws of the State of Washington, and is hereby confirmed by the Department of Ecology and entered of record as shown.

AR at 82 (formatting omitted) (emphasis added). The certificate holds a priority date of November 5, 1973. The certificate allows the use of 2,600 gallons per minute and 4,194 AFY and permits withdrawal of groundwater only from the one well in the industrial

6

park. Finally, the certificate designates the use of water as "community domestic supply, manufacturing and industrial use." AR at 82-83. The certificate read:

> This certificate of water right is specifically subject to relinquishment for nonuse of water as provided by RCW 90.14.180.

AR at 83.

As of 1976, the former park corporation held water right claims, certificates, or permits totaling a quantity of 9,274 AFY. Sometime thereafter the former park corporation transferred the industrial park and its appurtenant water rights to appellant Crown West. Crown West asserts that the former park corporation, itself, and tenants of the industrial park have invested tens of millions of dollars to expand and improve the park's facilities to the benefit of the industrial park's businesses. The Water Conservancy Board investigated the full history of water use at the industrial park. According to a Water Conservancy Board finding, the water rights attached to the industrial park have, since 1942, consistently "served thousands of persons' basic potable needs through lunch rooms, bathrooms, and other potable requirements." AR at 137. Nevertheless, the Conservancy Board's record does not identify any residential structures occupied between 1990 and 1998.

In 1998, a hotel with sixty-five rooms, each accommodating up to five persons, was constructed in the industrial park. Crown West contends the hotel has operated at high capacity since. The Department of Ecology notes that the Conservancy Board

7

record lacks any details as to the hotel's occupancy, the duration of guests' stays, or any other information suggesting a residential pattern of occupancy.

At some unknown date or dates, the park added four state-of-the-art warehouses, an office flex building, and retail space. These additions amount to more than 500,000 square feet of additional buildings on over 100 acres of park ground developed. By 2016, the industrial park functioned as the primary place of business for 194 businesses with a minimum of 5,000 employees served by 252 active water service connections spanning institutional, commercial, business, school, daycare, recreational, and industry purposes. Crown West asserts that industrial park inhabitants continue to use the water for a full range of residential uses, including washing, cooking, drinking, bathing, and irrigation.

The Water Conservancy Board found that "[a]t the time of peak use, [the industrial park used] 5874 acre-feet [of water from the wells] . . . when the park was still only about 2/3 built out with buildings." AR at 98. The Department of Ecology observes that neither the Conservancy Board's decision nor any of its supporting documents identify the date of peak water use at the industrial park or supply factual support for the annual quantities of use asserted by Crown West.

The industrial park's water system interties with the water system of Consolidated Irrigation District #19, which provides thousands of residential service connections. The intertie allows either the irrigation district or the park to draw water from the other's system in the event of an emergency. Neither party has yet to require the need of water

from the other entity, but operators periodically open the valves between the systems to ensure functioning of the intertie.

This appeal arises from Crown West's 2016 applications for a change in its water right for purposes of a transfer to Washington State's trust water program operated by the Department of Ecology. Washington State administers this trust program under chapter 90.42 RCW. This code chapter authorizes Ecology to hold water rights in trust for future use without the donor's risk of relinquishment. Water rights held in trust contribute to stream flows and groundwater recharge, while retaining their original priority date, because the owner of the water right agrees to keep its allotted water in a stream or aquifer. The trust water right may later revert to the original owner.

Before a transfer of a water right into the Washington water trust program, the trust program reviews the water right to assure that no five-year period passed without use of the water as stated on the certificate, permit, or claim. RCW 90.42.040, .080. In evaluating an application for a change or transfer of a water right, the trust program must perform a tentative determination of the validity and extent of the water right sought to be changed. RCW 90.42.040, .110. In the alternative, the water trust program determines if sufficient cause for nonuse is identified under RCW 90.14.140, a statute that lists exceptions to relinquishment. RCW 90.42.040.

As part of its applications, Crown West also sought to amend its certificates of water right. When someone applies to amend its certificates or change the manner or

place of use of the water, Ecology must conduct a tentative determination of the extent and validity of the applicant's water right pursuant to RCW 90.44.100.

Washington law has created water conservancy boards, available in designated counties across the state. Most eastern Washington counties, but few western Washington counties, have a conservancy board. A person seeking a transfer of a water right may elect to file its application for the transfer with the conservancy board. RCW 90.80.070. A conservancy board offers a faster option for a water right owner to process an application for a change or transfer of a water right. RCW 90.80.005, .070. The application must include information sufficient to establish to the Conservancy Board's satisfaction that a right to the quantity of water being transferred exists and a description of any applicable limitations on the right to use water, including the purpose of use. RCW 90.80.070(1). When a water right owner seeks to transfer or change the water right, the conservancy board assumes the duties of the Department of Ecology in reviewing the past and current use of the water right asserted under the claim, certificate, or permit. RCW 90.80.055.

A conservancy board lacks final authority to authorize a transfer into the water trust program. RCW 90.80.055(1)(b). Instead a water conservancy board processes a transfer application and issues a record of decision for the review of the Department of Ecology. RCW 90.80.070(4), .080(1). Ecology then renders a final decision to affirm, reverse, or modify the conservancy board's decision. RCW 90.80.080(4).

In March 2016, Crown West filed four applications for "change/transfer of a water right" with the Chelan County Water Conservancy Board. AR at 53, 58, 63, 68 (capitalization omitted). Each application sought to change the purpose of use, add a purpose of use, change or transfer the location of use, add points of diversion or withdrawal, and temporarily donate to the state trust water program for instream flows and mitigation. The applications noted that Crown West's current water rights were for "community domestic supply, manufacturing, and industrial use." AR at 54, 59, 64, 69 (capitalization omitted). Crown West impliedly deemed "community domestic supply" to be synonymous with a "municipal" supply of water. In the alternative, Crown West sought to recharacterize its use from community domestic supply to municipal supply. One section of each application sought a term of donation to the trust water program beginning April 1, 2016 and ending April 1, 2021, while another section of the form sought donation from April 1, 2017 to April 1, 2022. The applications sought approval of diversion of Columbia River water in Chelan County for landscape irrigation in favor of KMO Holdings from April 1 to October 31 in each donation year. Crown West noted that it owned 9,274 AFY of water, and it sought to temporarily donate 5,874 AFY.

As of the date of the applications, Crown West used only 3,400 AFY of water at the industrial park. Therefore, in effect, Crown West proposed to transfer 5,874 AFY of water it never used to allow another entity to take that amount from the Columbia River. A questioning person might conclude that Crown West's proposed donation gifted

11

nothing of value. Crown West described its applications as mitigating instream use presumably in the sense that the 5,874 AFY it donated would increase instream flow in the Columbia River. Nevertheless, its wells had no connection to the river. Although Crown West employed the Water Conservancy Board to approve its application, the application would divert water from the river rather than conserve river water.

In response to the four applications from Crown West, the Water Conservancy Board investigated the water use of Crown West at the industrial park. The Conservancy Board issued a tentative determination of the validity and extent of Crown West's water right to ascertain the amount of water eligible for change and donation. In order to avoid any relinquishment of its 9,274 AFY of water right from a lack of use, Crown West contended that the industrial park's distribution of well water fulfilled municipal water supply purposes. Thus, as part of its review, the Water Conservancy Board needed to assess whether the industrial park used its water for municipal water supply purposes.

In its report of examination, the Chelan County Water Conservancy Board wrote:

> The applicant, Crown West Realty, LLC owns and operates the water system that serves all parcels within the Spokane Industrial Park. All rights held by the water system collectively authorize 9274 acre feet of which the applicant wishes to temporarily place 5874 acre feet into trust for instream flows to create mitigation for out of stream uses and use a very small portion temporarily to do some landscape irrigation around an industrial facility in Chelan County. Since its water right documents reference only one well for each right the reserved quantities of each right will need to be authorized from all of the four wells in order for the system to function as designed. So the applicant requests authorization for a trust donation and for adding the existing wells as points of withdrawal for all

12

rights.  The right was perfected serving a residential population of 130 persons.  The application also requests that the purpose of use be conformed to "municipal."

. . . .

The right was perfected as a municipal right and the applicant requests that its authorized use be conformed to that designation.

. . . .

c) For the trust portion all the acre feet from the three claims are proposed to be temporarily placed into trust, as is 794 acre feet of the additive certificate, G322023CWRIS.  This portion of the right will temporarily join other instream flow rights within the State Trust Water Rights Program to create instream flow mitigation for other out of stream uses.  This component of the right is intended to take advantage of temporary reductions in uses at the existing place of use to enhance instream flows to create mitigation for other rights. . . .

*Public Interest (groundwater only)*

The proposed transfer is subject to RCW 90.44.100 and therefore, cannot be detrimental to the public interest, including impacts on any watershed planning activities. . . .

No detriments to public interest are presented by this decision.  The proposed changes will facilitate uses consistent with the relevant county land use and watershed plans which are the relevant expression of the public's interest for uses at those locations.  The authorized changes do not appropriate new quantities.  Only the changes being authorized are subject to the public interest test.

AR at 95-96 (underline omitted).  The Conservancy Board also wrote:

Any remaining portions of G3-22023CWR1S that have not been beneficially used would have been certificated based on the developed capacity of the system and would have been a "pumps and pipes" certificate.  These remaining quantities are also perfected as the result of being exempt from relinquishment as part of a municipal water right.  (See *Cornelius, et. al. v. Dept. of Ecology*, et. al.[, 182 Wn.2d 574, 344 P.3d 199] (2015) page 22 and the attached Analysis of Municipal Status of Water Rights)

AR at 97.  The Board added:

The right continues to provide for residential uses for a non residential population of approximately 6-7 thousand persons so it continues to meet the municipal supply definition and has done so at all times since its inception. The residential uses now include a hotel, restaurants, mini marts, as well as bathroom and kitchen facilities for the tenant's thousands of employees. While the claims and certificates use the term "domestic" and/or "community domestic" such terms are in this case synonymous with "municipal" and should be conformed as such. To qualify for placement into the State Trust program the right must either have been used in the last five years or qualify for the municipal exemption to relinquishment (RCW 90.42.080(4) and (11) and RCW 90.14.140(2)(d). The subject rights were perfected by actual beneficial uses in at least the amounts proposed for the trust and were used in the last five years. All inchoate amounts are also deemed perfected by operation of law since they are rights in good standing. (See *Cornelius* at page 22)

AR at 97. The Water Conservancy Board concluded:

The water proposed for change is valid to the full extent proposed for change as set forth herein.
. . . .
No portion of the right has been relinquished or abandoned. The right qualities for the municipal exception to relinquishment. There has never been an intent to abandon the right.
. . . .
The proposal will create no detriments to the public interest. The proposed changes will facilitate uses consistent with the relevant land use and watershed plans.

AR at 98-99.

The Conservancy Board found that the highest amount of water ever applied under the four rights was 5,874 AFY, which occurred sometime between World War II and the early 1970s. Water use declined thereafter. The Conservancy Board further found that the highest annual quantity of water actually used at the park since 1980 was 3,400 AFY,

the amount used during 2016. Finally, the Conservancy Board concluded that, with respect to Certificate No. G3-22023C, the certificate for the fourth well to withdraw 2,600 gallons per minute and 4,227 AFY, Crown West only ever used a small portion of the right.

Despite its findings regarding the extent of use of Crown West's water rights, the Water Conservancy Board issued four conditional decisions, including reports of examination, that tentatively granted Crown West's four applications. The decisions upheld the validity and eligibility for change of the full AFY of water rights.

The Water Conservancy Board also ruled that, assuming the industrial park had not utilized for at least five years its entire allotment of 9,274 AFY of water, Crown West had not relinquished any amount of its right because its water use met the statutory definition of a municipal water supply. The Conservancy Board wrote:

> The right was [Crown West's water rights were] perfected with demands that meet the definition of "municipal" water use since it served the residential needs of 127 persons and it also served a non residential population of 2700 for residential (typically potable) uses. . . . The right continues to provide for residential uses for a non residential population of approximately 6-7 thousand persons so it continues to meet the municipal supply definition and has done so at all times since its inception. The residential uses now include a hotel, restaurants, mini marts, as well as bathroom and kitchen facilities for the tenant's thousands of employees. While the claims and certificates use the term "domestic" and/or "community domestic" such terms are in this case synonymous with "municipal" and should be conformed as such.

Clerk's Papers at 10.

The Water Conservancy Board reasoned that Crown West's water right was for municipal water supply purposes because Crown West "contemplated municipal use." AR at 136. According to the Conservancy Board, once a water right holder claims a municipal use,

> the right is immune from relinquishment. In 1970 and 1973, when Crown's rights were either claimed or certificated, their uses qualified as municipal, as did the rights themselves. The claimed and authorized uses must have been intended to continue to serve these uses and are therefore perfected in the total quantities asserted. At the top of page 22, the [*Cornelius*] Court points out that the certificates do not even need to be fully used to be perfected in full and thus be available for changes/transfers.

AR at 136.

The Department of Ecology thereafter reviewed the Water Conservancy Board's findings. Ecology performed a mathematical calculation based on the findings. According to Ecology, assuming the Conservancy Board correctly found that Crown West used 5,874 AFY at its historical peak, water use had since declined at the industrial park by more than 2,000 AFY. Because the four water rights specified a collective maximum quantity of 9,274 AFY, the industrial park never used 3,400 AFY of the water. The Water Conservancy Board tentatively approved all 9,274 AFY as valid and eligible for change, such that Crown West could continue to use 3,400 AFY at the industrial park and transfer 5,874 AFY to the state trust program for instream flows and the mitigation of new out-of-stream uses. According to Ecology, the Water Conservancy Board's determination would anomalously allow 5,874 AFY of new water taken from rivers at

distant locations while use continued without reduction at the industrial park.

The Department of Ecology further noted that, for the Water Conservancy Board to find full usage of the AFY of water rights at the industrial park, the Conservancy Board must have assumed that the park pumped each of the three initial wells continuously at their maximum instantaneous quantities for twenty-four hours each day every day of the year. Ecology observed that the Water Conservancy Board inconsistently found that the current water demand at the industrial park was 3,400 AFY, because it determined that a much higher quantity of water remained valid for a transfer.

On September 20, 2016, the Department of Ecology reversed the Water Conservancy Board's decision and denied all four of Crown West's applications for change/transfer of a water right. Ecology ruled that Crown West failed to demonstrate that the water rights qualified as serving municipal supply purposes and ruled that the Water Conservancy Board erroneously assessed the extent and validity of the water rights.

The Department of Ecology's decision listed seven grounds for its denial of the applications for changes and donations into the water trust program: (1) an inadequate tentative determination of the extent and validity of the four water rights, (2) a failure to demonstrate that the four rights qualified as being for municipal supply purposes, (3) an erroneous change of inchoate water and a mistaken allowance of an increase in consumptive water use, (4) a failure to describe how other existing water rights within the

place of use will be exercised, (5) a failure to affirm that the proposed changes would not impair existing water rights, (6) a flawed consumptive water use analysis, and (7) a failure to demonstrate that approval of the applications would not be detrimental to the public interest.

In its ruling, the Department of Ecology relied on its POL-2030, the department's 2003 Municipal Water Law Interpretive and Policy Statement, promulgated in 2007. The statement sought to comprehensively address the entire 2003 Municipal Water Law legislation. Portions relevant to the nonresident residential use language of RCW 90.03.015(4) declare:

> [P]ursuant to RCW 34.05.230(1) this interpretive and policy statement *is advisory only*.
>
> . . . .
> *RCW 90.03.015(3) & (4) DEFINITIONS of "Municipal Water Supplier" and "Municipal Water Supply Purposes." This section defines water rights that are for municipal water supply purposes.*
>
> . . . .
> 4. If one purpose of use on a water right is for a municipal water supply purpose, then another purpose of use under the same water right is for a municipal water supply purpose when it is a use generally associated with a municipality.
>
> . . . .
> 7. If a municipal water supplier holds or acquires a water right not for municipal water supply purposes, the purpose of use may be changed to municipal water supply purposes under RCW 90.03.380. The statutory tests for a change must be satisfied. Also, the beneficial use following the change must meet a definition in this section. Changes under RCW 90.03.380 require a tentative determination of the extent and validity of the water right proposed for transfer or change.
>
> . . . .
> 9. Ecology interprets the statute as requiring active compliance by

18

conformance with the beneficial use definitions in RCW 90.03.015(4). Examples of conformance with the definitions include but are not limited to the following:

a. Conformance with the definition occurs where a water right holder uses water for one or more of the categories of beneficial use included in the definition of a water right for municipal water supply purposes (e.g. the residential connection or nonresident population thresholds under RCW 90.03.015).

. . . .

c. A water right authorized for one or more of the categories of beneficial use included in the definition of municipal water supply purposes that has been integrated or consolidated through Ecology action(s) or statutory procedure(s) (e.g. new permit, change decision, replacement or new additional well, showing of compliance under RCW 90.44.100(3), consolidation of rights for exempt wells under RCW 90.44.105) such that two or more water rights or water sources have alternate, well field, non-additive (formerly "supplemental"), or other relationships will be recognized as in conformance with the definitions.

d. If a water right does not meet the definition of a water right for municipal water supply purposes for 5 or more years, or does not otherwise qualify for the relinquishment exception under RCW 90.14.140(2)(d), then the water right would be valid only to the extent it had been beneficially used during that period, with any non-use resulting in relinquishment of the right unless the non-use is excused by one of the other exemptions to relinquishment provided under RCW 90.14.140.

*RCW 90.03.015(4)(a) DEFINITIONS - Defines Required Number of Residential Connections and Non-Residential Population for Municipal Water Supply Rights.* The statutory definitions in this subsection do not exactly match the Department of Health rules for Group A water systems under WAC 246-290-020.

. . . .

2. RCW 90.03.015(4)(a) provides statutory definitions for municipal water suppliers holding water rights for municipal water supply purposes. These definitions overlap Department of Health rules for Group A water systems, but they are not exactly the same.

3. All municipal water suppliers under this section are Group A water systems. However, not all Group A water systems are municipal water suppliers.

. . . .

9.  The Municipal Water Law does not include a minimum service connection requirement for nonresidential connections.  RCW 90.03.015(4)(a) defines a water right for municipal water supply purposes in terms of nonresidential populations (residential use of water for a nonresidential population of, on average, at least twenty-five people for at least sixty days a year).  Therefore, this category includes some Group A non-community systems and excludes others, depending upon particular factual situations.

10.  Ecology interprets the phrase "residential use of water for a nonresidential population, to mean that the full range of residential water uses (e.g. drinking, cooking, cleaning, sanitation) are provided under the water right.  Further, such service is for temporary domiciles for non-residents (an average of 25 or more people living there for more than 60 days per year).  Examples of Group A non-community systems that might hold water rights for municipal water supply purpose under this section under particular factual situations could include vacation homes and temporary farm worker housing.

11.  The following Group A non-community systems would not typically hold rights under RCW 90.03.015(4)(a) for municipal water supply purposes under the residential water use for a non-resident population definition:

- o schools,
- o daycares,
- o churches,
- o campgrounds,
- o fairgrounds,
- o restaurants,
- o businesses and
- o factories.

Actual determination of whether such systems hold water rights for municipal supply purposes will depend upon the particular factual situations.

AR at 143-47.

PROCEDURE

Crown West appealed the Department of Ecology's water rights determination to the Hearings Board. In turn, both parties moved for summary judgment. The Hearings Board granted Ecology's motion. Although the cross summary judgment motions raised numerous issues, the Hearings Board limited its decision to a ruling that Crown West's water right did not qualify under RCW 90.03.015(4) as municipal in nature. This ruling negated the need to decide other issues. Other questions included whether the proposed change would impair other water rights, increase consumptive use of water, or be detrimental to the public interest, three additional requirements for a transfer to the state trust water program.

The Hearings Board determined that Crown West failed to demonstrate that its water rights qualified as being for municipal purposes through "active compliance" with the definition of "municipal water supply purposes" under RCW 90.03.015(4). The Hearings Board pulled the "active compliance" standard from POL-2030. AR at 144. The Hearings Board concluded that, to benefit from this municipal water designation, Crown West needed to show that the industrial park's use of its well water served a municipal purpose under the statute during every five-year period from inception of use to the present. Even though the Department of Ecology conceded that the United States Navy's use of the water right entailed a municipal purpose, the Hearings Board determined that Crown West's recent use of the water right did not fall within the

21

statutory definition. Therefore, the water right did not enjoy exemption from relinquishment, and the Water Conservancy Board erred in allowing a transfer of 5,874 AFY of unused water to the state trust water program.

Crown West appealed the Hearings Board's decision to the superior court, while also filing a motion with the Hearings Board to issue a certificate of appealability directly to this appeals court under RCW 34.05.518. The Department of Ecology did not oppose the motion, and the Hearings Board together with our court commissioner granted direct appeal to this court.

## LAW AND ANALYSIS

On appeal to this court, Crown West contends the Hearings Board erroneously denied Crown West's water right a municipal water supply status for purposes of the relinquishment exception. When challenging the Hearings Board's ruling, Crown West forwards several arguments. First, the water right holder need not establish "active compliance" with the standard of "municipal water supply purposes" for every five-year period during ownership of the right. Br. of Pet'r at 7. Second, the water right holder need only comply with a beneficial use standard at the time the holder and the Department of Ecology initially classified the water right. Third, the water right holder's claimed use or contemplated use, rather than actual use, controls the character of the water right as being for municipal water supply purposes. Fourth, Ecology's "active compliance" standard adopted in POL-2030 conflicts with the streamlined process the

Department of Ecology employs when reviewing a water right. Fifth, the Department of Ecology mistakenly requires the nonresidential population, referenced in RCW 90.03.015(4), as demanding identity of people throughout the sixty days and overnight stays. Sixth, Crown West's intertie with Consolidated Irrigation District #19's water system qualifies Crown West's water right as being for municipal water supply purposes. The first three arguments conflate, and we will address the arguments together. We begin though with a review of primary principles of Washington water law, which provides a backdrop to a discussion of when should water rights be classified as serving municipal water supply purposes in order to avoid relinquishment from nonuse.

Beneficial Use and Relinquishment

Washington's water law, promulgated throughout the state's history by statute and case law, follows the western American doctrine of water rights by appropriation rather than the eastern rule of riparian water rights. RCW 90.03.010; *Cornelius v. Department of Ecology*, 182 Wn.2d 574, 586, 344 P.3d 199 (2015); *Ellis v. Pomeroy Improvement Co.*, 1 Wash. 572, 578, 21 P. 27 (1889). Under the appropriation system, the user who claims the right to appropriate water must actually do so. The water right holder must put the water claimed under the right to beneficial use or it relinquishes the right. RCW 90.14.160; *Department of Ecology v. Theodoratus*, 135 Wn.2d 582, 587, 957 P.2d 1241 (1998). The legislature has declared:

A strong beneficial use requirement as a condition precedent to the continued ownership of a right to withdraw or divert water is essential to the orderly development of the state.

RCW 90.14.020(3).

Under Washington's 1917 Water Rights Code, all unclaimed water belongs to the State of Washington. Washington law demands that a water right return to the state, under relinquishment statutes, to the extent that, without cause, the water right holder voluntarily fails to beneficially use all or any portion of the water right for a period of five successive years. RCW 90.14.160-.180; *Department of Ecology v. Acquavella*, 131 Wn.2d 746, 758, 935 P.2d 595 (1997). Accordingly, RCW 90.03.010 declares in part:

Subject to existing rights all waters within the state belong to the public, and any right thereto, or to the use thereof, shall be hereafter acquired only by appropriation for a beneficial use and in the manner provided and not otherwise. . . .

Relinquishment prevents water hoarding and promotes efficient use of the state's limited supply of water.

As well as being critical to establishing the existence of a water right, beneficial use establishes the quantity of that right. A user acquires the right only to the quantity of water actually put to use with reasonable diligence. *Department of Ecology v. Acquavella*, 131 Wn.2d at 755 (1997). "[B]eneficial use is 'the basis, the measure, and the limit'" of a water right. *Department of Ecology v. Acquavella*, 131 Wn.2d at 755. The requirement of a beneficial use applies even if the water right holder constructs

facilities for diversion of a larger quantity of water than the holder uses. *Department of Ecology v. Theodoratus*, 135 Wn.2d at 593-95 (1998).

If a water right holder fails to beneficially use any or all of its right for five successive years, the right holder loses all or a portion of the right unless it shows its nonuse falls under one of the narrow categories in RCW 90.14.140. RCW 90.14.140(2)(d); *Department of Ecology v. Acquavella*, 131 Wn.2d at 758 (1997). One exception, and the exception asserted by Crown West in this appeal, is water used for municipal water supply purposes. The law determines relinquishment at the time of the expiration of the five years of nonuse. Events occurring after the five-year statutory period of a water right's nonuse matter none because relinquishment already occurred. RCW 90.14.180, .130; *Cornelius v. Department of Ecology*, 182 Wn.2d at 617 (2015).

In Washington State, the law limits each water right to an amount of use in gallons and acre-feet per year to a source of diversion, and to a purpose of use. The source of diversion for groundwater is a discrete well. The source of diversion for surface water is a spot along a stream, river, or lake.

Washington law classifies water uses into ten perhaps overlapping categories of uses or purposes. RCW 90.14.031 declares:

> (2) "Beneficial use" shall include, but not be limited to, use for *domestic water*, irrigation, fish, shellfish, game and other aquatic life, *municipal*, recreation, industrial water, generation of electric power, and navigation.

(Emphasis added.)  One statute designates a differing list of beneficial uses:

> (1) Uses of water for *domestic*, stock watering, industrial, commercial, agricultural, irrigation, hydroelectric power production, mining, fish and wildlife maintenance and enhancement, recreational, and thermal power production purposes, and preservation of environmental and aesthetic values, and all other uses compatible with the enjoyment of the public waters of the state, are declared to be beneficial.

RCW 90.54.020 (emphasis added).  Each water right must be designated for one or more purposes depending on the actual employment of the water.  A change to a water right's amount, source of diversion, or use requires the administrative process overseen by the Washington State Department of Ecology and already described.

Municipal Water Law

We will later discuss in detail whether Crown West's use of its water right included a use for municipal water supply purposes.  This determination looms critical to whether Crown West relinquished any of its water right.  We now briefly review the law about a municipal water supply.

Since 1967, the Washington statutory scheme has treated a water right claimed for municipal water supply purposes as immune from statutory relinquishment, while nonmunicipal water rights may be relinquished through nonuse.  LAWS OF 1967, ch. 233, § 18 (codified as RCW 90.14.180); *cf.* LAWS OF 1967, ch. 233, § 14 (codified as RCW 90.14.140(2)(d)).  The legislature wishes municipal purveyors to be capable of meeting future municipal needs despite a lack of exercise of the entire amount of the water right.

26

RCW 90.14.140(2) now reads:

> Notwithstanding any other provisions of RCW 90.14.130 through 90.14.180, there shall be no relinquishment of any water right:
>
> . . . .
>
> (d) If such right is claimed for municipal water supply purposes under chapter 90.03 RCW.

Despite this favorable treatment, until recently, our laws did not define "municipal water supplier" or "municipal water supply purposes."

In 2003, our legislature amended the water law act. *Lummi Indian Nation v. State*, 170 Wn.2d 247, 251, 241 P.3d 1220 (2010); LAWS OF 2003, 1st Spec. Sess., ch. 5; SECOND ENGROSSED SECOND SUBSTITUTE H.B. 1338, 58th Leg., 1st Spec. Sess. (Wash. 2003) (2E2SHB 1338). Litigants typically refer to the body of 2003 legislation concerning municipal water as the "Municipal Water Law." *Cornelius v. Department of Ecology*, 182 Wn.2d at 613 n.10 (2015) (Madsen, C.J., dissenting). The law defined "municipal water supplies and supplier" and "municipal water supply purposes" for the first time.

Under the 2003 Municipal Water Law, when requested by a municipal water supplier or when processing a change or amendment to the water right, the Department of Ecology shall amend the municipal water supplier's water right documents and related records to ensure that a water right for municipal water supply purposes, as defined in RCW 90.03.015, is correctly identified as being for such purposes. *Lummi Indian Nation v. State*, 170 Wn.2d at 260 n.8 (2010). No portion of a right held or acquired by a

municipal water supplier should be so identified without the approval of a change or transfer of the right or portion of the right for such a purpose. RCW 90.03.560.

Time of Purpose of Use

We move further into our analysis of whether Crown West's water right qualifies for municipal water supply purposes. Crown West and its predecessors in interest pumped groundwater from wells beginning in 1942. A preliminary question then ensues: On what date do we assess whether the use of water at the Spokane Valley industrial park constituted or constitutes a municipal water supply? We later inquire whether the industrial park qualified as a municipal water supplier on that date. More importantly, we then ask under what standard we determine if the industrial park beneficially used the water right on the critical date.

We could rest our decision solely on the basis that Crown West does not qualify as a municipal water supplier, except that the Department of Ecology agrees that the industrial park water system qualified as a municipal water supplier from 1942 to 1958. This concession begs the question: If Crown West once qualified as a municipal water supplier does that qualification continue indefinitely or at least until it applied for a change in use and transfer of diversion in 2016? We conclude that the law requires the assessment of a municipal water supplier status as of the date that the water right holder applies for a change in use or a transfer.

28

Crown West contends that the water right holder need not show current or active compliance with the dictates of a municipal water supply usage at the time it applies to the Department of Ecology for a change in use of the water right or to enter the trust water program. Instead, the date that the holder first claimed the water right or the date of a certificated water right controls, and, if the holder then claimed its use constituted municipal water supply usage, that claimage controls. Crown West may further argue that, even if the purposes served by the water right did not qualify for municipal water supply purposes at the time of the claim or certificate, the water right still qualifies if its owner intended to use the water rights for municipal water supply purposes in some indefinite future.

The controlling statute is RCW 90.03.015. The statute declares, in part:

> (3) "Municipal water supplier" *means* an entity that *supplies* water for municipal water supply purposes.
> (4) "Municipal water supply purposes" *means a beneficial use of water:* (a) For residential purposes through fifteen or more residential service connections or for providing residential use of water for a nonresidential population that is, on average, at least twenty-five people for at least sixty days a year; (b) for governmental or governmental proprietary purposes by a city, town, public utility district, county, sewer district, or water district; or (c) indirectly for the purposes in (a) or (b) of this subsection through the delivery of treated or raw water to a public water system for such use. If water *is beneficially used* under a water right for the purposes listed in (a), (b), or (c) of this subsection, any other beneficial use of water under the right generally associated with the use of water within a municipality is also for "municipal water supply purposes," including, but not limited to, beneficial use for commercial, industrial, irrigation of parks and open spaces, institutional, landscaping, fire flow, water system maintenance and repair, or related purposes. If a governmental entity *holds*

29

> a water right that is for the purposes listed in (a), (b), or (c) of this subsection, its use of water or its *delivery* of water for any other beneficial use generally *associated* with the use of water within a municipality *is* also for "municipal water supply purposes," including, but not limited to, beneficial use for commercial, industrial, irrigation of parks and open spaces, institutional, landscaping, fire flow, water system maintenance and repair, or related purposes.

(Emphasis added.) We italicize several verbs to show that the statutory definition of municipal water supplier and municipal water supply purposes is determined in the present tense. Usage of this tense presumes a legislative intent to adjudge the character of the water right in the present.

A legislative body's use of a verb tense holds significance in construing statutes. *United States v. Wilson*, 503 U.S. 329, 333, 112 S. Ct. 1351, 117 L. Ed. 2d 593 (1992); *State v. Stout*, 362 Or. 758, 415 P.3d 567, 574 (2018). The use of the present tense in a statute strongly suggests it does not extend to past actions. *Carr v. United States*, 560 U.S. 438, 449, 130 S. Ct. 2229, 176 L. Ed. 2d 1152 (2010). A statute's undeviating use of the present tense presents a striking indicator of its prospective orientation. *Carr v. United States*, 560 U.S. at 449.

Our interpretation of RCW 90.03.015(4) coincides with a fundamental principle of Washington water law. The statutory subsection refers to "a beneficial use of water." "Beneficial use" is a term of art in Washington water law that means an actual use of water, rather than a potential future use. *Department of Ecology v. Theodoratus*, 135 Wn.2d at 589 (1998). Presumably, this principle applies equally to exclude past use.

30

Crown West characterizes an emphasis on the legislature's use of the present tense as dubious since statutory definitions are nearly always phrased in this tense. In so contending, however, Crown West only mentions the verb "means" found in both RCW 90.03.015(3) regarding the definition of "municipal water supplier" and RCW 90.03.015(4) regarding the definition of "municipal water supply purposes." Crown West ignores all of the other present tense verbs found in RCW 90.03.015's definitions. Crown West also ignores decisions that emphasize the tense of verbs employed in statutes.

RCW 90.14.140 exempts certain water uses from relinquishment, including municipal water supply purposes. The statute declares:

> "[S]ufficient cause" shall be defined as the nonuse of all or a portion of the water by the owner of a water right . . . .
> (d) If such right is *claimed* for municipal water supply purposes. . . .

RCW 90.14.140(1)(2)(d) (emphasis added). Based on this language, Crown West may argue that the relevant question for purposes of relinquishment is whether a right is "claimed" for municipal purposes and not whether the right is "issued" for municipal purposes. This argument renders irrelevant any determination of the date on which we determine the nature of Crown West's use. Nevertheless, such a reading omits any qualification for municipal water supply purposes since any party could "claim" municipal water supply purposes without any facts supporting the claim. We doubt the legislature intended a perpetual relinquishment exemption for all water rights when an

31

entity merely contemplated or intended a municipal use, regardless of the actual beneficial uses occurring under the right. Such a reading also conflicts with other sections of the water code.

In *City of Union Gap v. Department of Ecology*, 148 Wn. App. 519, 195 P.3d 580 (2008), this court rejected a broad interpretation of the "claimed for" language of RCW 90.14.140 in the context of the municipal relinquishment exemption. In considering whether the city's nonuse of its water right was excused under the municipal relinquishment exemption, the court concluded that a water right holder must timely assert its water right for municipal water supply purposes within the five-year period.

In recognition of its broad reading of the word "claimed" in RCW 90.14.140, Crown West may limit its argument to a claimed water right for municipal purposes only if the water right holder pursues such purpose with reasonable diligence. Nevertheless, the statute does not include the term "reasonable diligence." We acknowledge use of the concept "reasonable diligence" in the setting of perfecting a water right after the Department of Ecology issues a permit for a right. RCW 90.03.320, .460. Nevertheless, we see no legislative intent in the water code to afford a water right holder, who uses none of its water for municipal water supply purposes, the favorable status of municipal water supplier based on a claim of such purposes if the holder reasonably pursues the purpose for an indefinite time in the future. In addressing the exceptions to relinquishment, we must consider that exceptions to statutory provisions are narrowly

32

construed. *R.D. Merrill Co. v. Pollution Control Hearings Board*, 137 Wn.2d 118, 140, 969 P.2d 458 (1999).

Assuming we reject the argument that the water right holder's "claim" can qualify the holder as a municipal water supplier, Crown West next contends that the use for which the Department of Ecology authorized controls whether the use is one for municipal water supply purposes. This argument also renders moot any decision of when to assess whether the holder qualifies as a municipal water supplier. Again, we see no legislative intent for such a construction of RCW 90.03.015(4). The statutory definition employs the present tense and refers none to the application or authorization process. We must construe the statutory definition narrowly.

According to amici, if the Department of Ecology determines municipal water supplier status as of the date of the application for a change or transfer of the water right, a municipality could lose a portion of its water right if it does not currently use all of the right. In turn, amici note the inconsistency between this predicament and the statute that excludes a municipal water supplier from the requirement that the water right holder employ all of its water right in order to prevent relinquishment.

We need not address this concern since the facts of this appeal do not present circumstances under which we must decide to what extent a municipality might lose a portion of its water right by nonuse. We also question the analysis presented by amici. RCW 90.03.015(4) does not require that a municipality "beneficially use" all of its water.

Instead, the subsection refers to a municipal water supply purpose as a "beneficial use" of water. The word "use" functions as a noun, not a verb, in this setting, and the word "beneficial" performs as an adjective, not an adverb. Thus, RCW 90.03.015(4) emphasizes the type of use, not the amount of use. The term "beneficial use" also encompasses the types of activities for which water may be used. *In re Rights of Surface & Ground Waters of Marshall Lake & Marshall Creek Drainage Basin*, 121 Wn.2d 459, 468, 852 P.2d 1044 (1993). As long as the water is used for a beneficial use, the relinquishment waiver applies. Therefore, one could conclude that the municipality need only apply some of its use to a municipal water supply purpose in order to avoid a loss of a portion of the unused right in order to avoid relinquishment.

Amici's concern also conflicts with another statute, at least as to certificates issued to municipalities before September 9, 2003. Water right certificates issued prior to September 9, 2003, for municipal water supply purposes based on system capacity remain in good standing. LAWS OF 2003, 1st Spec. Sess., ch. 5; 2E2SHB 1338; H.B. REP. ON 2E2SHB 1338, at 1-2, 58th Leg., 1st Spec. Sess. (Wash. 2003).

The Department of Ecology asserts that "active compliance" with municipal water supply purposes is required for the municipal water supplier to retain its preferred status. The Department of Ecology further demands that compliance with the standard be demonstrated for each five-year period from the right's inception to the present. In short, Ecology impliedly asks that we adopt its POL-2030.

34

Crown West and amici note that the Washington water code never employs the term "active compliance." According to amici, the Department of Ecology's interpretation conflicts with the objective of the 2003 Municipal Water Law to provide certainty to municipal water suppliers and to require increased water conservation and efficiency. One might also wonder why the Department of Ecology needs to change the statutory term "beneficial use" to "active compliance" and whether the concept conflicts with the Supreme Court's decision in *Cornelius v. Department of Ecology*, 182 Wn.2d 574 (2015).

We particularly note that our ruling may conflict with POL-2030 section 9d:

If a water right does not meet the definition of a water right for municipal water supply purposes for 5 or more years, or does not otherwise qualify for the relinquishment exception under RCW 90.14.140(2)(d), then the water right would be valid only to the extent it had been beneficially used during that period, with any non-use resulting in relinquishment of the right unless the non-use is excused by one of the other exemptions to relinquishment provided under RCW 90.14.140.

We reserve approval or disapproval of POL-2030 for another day and perhaps another court because of its irrelevance to our ruling.

The Department of Ecology emphasizes that this appeal arises from a change and transfer of a water right sought by Crown West. The Department of Ecology argues that Crown West may only change or transfer its right to the extent of its use. RCW 90.03.380 permits a change in rights only to the extent the holder has applied the water to beneficial use. RCW 90.42.080 limits the quantity of water that can be placed into trust

to the quantity actually used by the applicant. The Department of Ecology may be correct, but the Hearings Board never reached this question. We also do not rely on RCW 90.03.380 or RCW 90.42.080 because of our interpretation of RCW 90.03.015(4).

Municipal Water Supplier

We now analyze whether Crown West qualified as a municipal water supplier when it filed its 2016 applications for a change of use and transfer. Each of Crown West's Department of Ecology certificates of water right declares the water use to be for "community domestic supply, manufacturing, and industrial use." AR at 402, 404, 406. Each certificate also proclaims the right to be subject to relinquishment. As part of its 2016 applications for a change in use, Crown West seeks recharacterization of its water usage to municipal water supply purposes. This relabeling would presumably avoid any relinquishment of the water right.

The labeling of a water certificate as one for domestic use does not prevent reclassification to municipal water supply purposes. *Cornelius v. Department of Ecology*, 182 Wn.2d 574 (2015). We assume that a certificate for industrial or manufacturing use may also be reissued for municipal uses. RCW 90.03.560 reads, in part:

> When requested by a municipal water supplier or when processing a change or amendment to the right, the department shall amend the water right documents and related records to ensure that water rights that are for municipal water supply purposes, as defined in RCW 90.03.015, are correctly identified as being for municipal water supply purposes.

One likely will be a municipal water supplier if one is a government entity, but

one need not necessarily be a governmental unit to qualify.  Again, RCW 90.03.015

declares, in part:

> (4) "Municipal water supply purposes" *means a beneficial use of water:* (a) For residential purposes through fifteen or more residential service connections *or for providing residential use of water for a nonresidential population that is, on average, at least twenty-five people for at least sixty days a year*; (b) for governmental or governmental proprietary purposes by a city, town, public utility district, county, sewer district, or water district; or (c) *indirectly for the purposes in (a) or (b)* of this subsection through the delivery of treated or raw water to a public water system for such use.

(Emphasis added.)  WAC 173-505-030, a rule promulgated by the Department of

Ecology, repeats, but does not clarify, the definition.

Crown West claims that, as a nongovernment entity, it fulfills the language of

definitions (a) and (c).  Crown West underlines that its water system delivers water to

5,000 to 6,000 employees who daily work at the industrial park and use the water for

drinking, cleansing, toileting, and even cooking.  Crown West highlights that the

industrial park includes a hotel with overnight guests that use water for the same

purposes.

The Hearings Board found that Crown West does not connect its water system to

fifteen or more residences.  Crown West does not challenge this finding on appeal.  Thus,

we must decide whether the second half of the definition in section (a) in the statute

applies.  We must discern whether Crown West provides "residential use of water for a

nonresidential population that is on average, at least twenty-five people for at least sixty

37

days a year." RCW 90.03.015(4)(a). We refer hereafter to this language as the "second statutory definition" or simply the "definition."

No case discusses the second statutory definition. Going further, no Washington court has interpreted the legislature's intent behind any portion of RCW 90.03.015(4)'s definition of municipal water supply purposes. Other western states' water laws lack relevance because the law does not contain the same definition. Legislative history of the statute does not assist because the history lacks any indication as to the types of places falling under this definition.

We mention some rules of statutory construction. The purpose of statutory interpretation is to determine and give effect to the intent of the legislature. *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013). When possible, we derive legislative intent solely from the plain language enacted by the legislature. *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). But we must also consider the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole. *Department of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). When the legislature has not defined a term, we may look to dictionary definitions. *In re Detention of J.N.*, 200 Wn. App. 279, 286, 402 P.3d 380 (2017), *review granted*, 189 Wn.2d 1031, 407 P.3d 1147 (2018). When the legislature uses two different terms in the same statute, courts presume the legislature intends the terms to have different meanings. *State v. Barnes*, 189 Wn.2d 492, 502, 403 P.3d 72 (2017). A

municipal water supplier enjoys an exception from relinquishment of the water right. We construe exceptions narrowly. *R.D. Merrill Co. v. Pollution Control Hearings Board*, 137 Wn.2d at 140 (1999).

The relevant language of RCW 90.03.015(4) and the parties' respective contentions raise the following questions concerning when an entity qualifies under the second statutory definition. What constitutes a residential use of water? When does a nonresidential population employ water for a residential use? Does residential use include water used for drinking and cleaning by employees of businesses or industries? What is a nonresidential population? Does a nonresidential population include employees of businesses and industries? Does a nonresidential population include hotel guests? Must the nonresidential population stay overnight? Must the nonresidential population stay in temporary housing but have a permanent residence elsewhere? Must the twenty-five people be the same people over a period of sixty days?

RCW 90.03.015(4) does not list examples of residential water use. The parties catalogue residential uses of water as drinking, cooking, cleaning, flushing waste, and watering grass. Compiling such a list, however, does not necessarily end our task of discerning what constitutes a "residential use" under the second statutory definition. After reading RCW 90.03.015(4) as a whole and perusing definitions for "residential use," we conclude that the term "residential use" within the second statutory definition includes use of water within a residential setting. Thus, we disagree with Crown West

that use of water for drinking, cleaning, toileting, or cooking within any setting

constitutes a "residential use" within the meaning of the statute. Use of water for

cleaning and drinking in an office, commercial, or industrial setting does not constitute a

residential use. Water for cleaning and drinking is attended to nearly every setting

including commercial, industry, and agricultural settings, such that Crown West's broad

view of the term would have few, if any, limits.

RCW 90.03.015(4) sometimes attaches the indefinite article "a" to a noun or an

adjective and a noun. For example, the statute refers to "*a* beneficial use" and "*a* non-

residential population." (Emphasis added.) But the statute omits the indefinite article

before the phrase "residential use." The term "residential use" connotes a concept

narrower than "a residential use" in that the latter could refer to any of many residential

uses. The idea of "residential use" must then mean something different than uses for

which water can be employed inside a residence.

To repeat, RCW 90.03.015 holds two distinct definitions for "municipal water

supply purposes":

> (4) "Municipal water supply purposes" means a beneficial use of
> water: (a) For *residential purposes* through fifteen or more residential
> service connections *or* for providing *residential use* of water for a
> nonresidential population that is, on average, at least twenty-five people for
> at least sixty days a year. . . .

(Emphasis added.) The first definition includes the phrase "residential purposes" and the

second statutory definition employs the term "residential use." Based on a standard rule

of construction, "residential use" must mean something different from "residential purposes." We conclude that something different is the use of water within a residential setting.

We rely on an Indiana decision's analysis of "residential use," in the context of a restrictive property covenant dispute.

> Residential is defined as "of or relating to residence or residences." Merriam-Webster's Collegiate Dictionary 996 (10th ed. 1994). Residence is defined as "the place where one actually lives as distinguished from one's domicile or a place of temporary sojourn." *Id.* Our court has previously determined that the "plain and ordinary meaning of 'residential purpose'" is "one in which people reside or dwell, or in which they make their homes." The people who rent Colucci's cabins use the structures for eating, sleeping, and other typical activities associated with a residence or dwelling place. Although we recognize that the renters' occupation of the cabins is only on a temporary basis and the definition of residential seems to contemplate a more permanent presence, we find that this definition is at odds with the covenant language explicitly allowing the rental or lease of property. If the term "residential use" as used in the covenant language was meant to only apply to permanent and not temporary rental of property, then it would have been easy to explicitly state this and make the covenant unambiguous. In Indiana, restrictive covenants are disfavored and are strictly construed with all doubts resolved in favor of the free use of property and against restrictions. We therefore conclude that, because the language in the covenants is ambiguous, Colucci's short-term rental of its cabins does not run afoul of the covenants.

*Applegate v. Colucci*, 908 N.E.2d 1214, 1220 (Ind. Ct. App. 2009) (most citations omitted). We note that the Indiana decision mentions temporary and permanent rentals and both constitute a "residential use."

From other jurisdictions come similar definitions of "residential use." The definition of "residential use" means "the use of property for living purposes." *Winn v. Ridgewood Development Co.*, 691 S.W.2d 832, 834 (Tex. App. 1985). Thus, "residential use" or property should not be for work purposes. College dormitories are residential buildings occupied or intended to be occupied as a dwelling, and thus a dormitory is included in an ordinance's definition of "residential use." *Myers Park Homeowners Association v. City of Charlotte*, 229 N.C. App. 204, 213, 747 S.E.2d 338 (2013). A unit providing an independent kitchen, bathroom, and sleeping facilities qualifies as a "residential use." *Adams v. Town of Brunswick*, 2010 ME 7, 987 A.2d 502, 507-08. Accordingly, a "residential use" should include facilities for an overnight stay, but for more than an overnight stay. A "residential use" should allow for independent living for weeks, if not months. Some, but few, hotels include kitchen facilities. No evidence supports a finding that the hotel inside the Crown West industrial park facilitates independent living and functions as a temporary dwelling. We might, however, consider an extended-day hotel to qualify.

Crown West contends that the Department of Ecology's construction of "residential use" essentially means that a "residential population" must reside in the structures served by a municipal water supplier despite the statute referencing a "nonresidential population." Crown West may criticize our analysis as suffering from this same anomaly or oxymoronic paradox since we hold that the term "residential use"

means something akin to residing in a home when the second statutory definition applies only to nonresidents. Nevertheless, in addition to giving import to the phrase "nonresidential population," we must provide meaning to the word "residential." We discern no inconsistency in our analysis, when viewed in the light that nonresidents may temporarily use home-like environments as temporary residences.

We agree with the Department of Ecology that we should construe the term "residential use" in light of the numbers and time constraints imposed on the nonresidential population inside the second statutory definition. The statutory language mentions "a nonresidential population that is, on average, at least twenty-five people for at least sixty days a year." RCW 90.03.015(4)(a). We need not discern the full implications of this language or answer all of the questions posed by the parties because of the limited circumstances of this appeal. Nevertheless, the language suggests more than one or two overnight stays by a hotel guest and implies some temporary living quarters.

Crown West argues that the legislature modeled RCW 90.03.015(4) after the Department of Health regulations relating to noncommunity transient and nontransient water systems under WAC 246-290-020(5)(b). For purposes of regulation, the Washington Department of Health classifies public water systems into Group A systems and Group B systems. WAC 246-290-020. A "Group A" system is a public water system that provides service such that the system fulfills the definition of a public water

system provided in the 1996 amendments to the federal Safe Drinking Water Act (Public

L. No. 104-182, § 101(b)).  WAC 246-290-020(4).  The regulation further categorizes

Group A water systems into community and noncommunity water systems.  In turn, the

regulation categorizes noncommunity water systems as "nontransient systems" and

"transient systems."  The regulation reads:

> (b) **Noncommunity** water system means a **Group A** water system that is not a **community** water system.  **Noncommunity** water systems are further defined as:
> (i) **Nontransient (NTNC)** water system that provides service opportunity to *twenty-five or more of the same nonresidential people for one hundred eighty or more days* within a calendar year.
> Examples of a **NTNC** water system might include a school, day care center, or a *business, factory*, *motel*, or restaurant with *twenty-five or more employees* on-site.
> (ii) **Transient (TNC)** water system that serves:
> (A) *Twenty-five or more different people each day for sixty or more days* within a calendar year;
> (B) *Twenty-five or more of the same people each day for sixty or more days*, but less than one hundred eighty days within a calendar year; or
> (C) One thousand or more people for two or more consecutive days within a calendar year.
> Examples of a **TNC** water system might include a *restaurant, tavern, motel, campground, state or county park, an RV park, vacation cottages, highway rest area, fairground, public concert facility, special event facility, or church.*

WAC 246-290-020(5).

When dissecting the Department of Health definitions of "transient" and

"nontransient" noncommunity water systems, we note that both definitions repeat in part

the requirement of "twenty-five people" found in RCW 90.03.015(4)'s second statutory

definition. Nevertheless, neither of the Department of Health definitions includes the qualifier "residential use." As with the nonresidential population in RCW 90.03.015(4)'s definition, the twenty-five people within the nontransient system must be nonresidential. Nevertheless, WAC 246-290-020(5)(b)(i) demands that the twenty-five people be the same people, whereas RCW 90.03.015(4) omits the word "same." Under the regulation, the nonresidential population must be present at least one hundred and eighty days. The second statutory definition in RCW 90.03.015(4) requires a presence for at least sixty days. Crown West highlights the examples given of nontransient systems, such as a hotel and other businesses, and the identification of employees as nonresidential people.

The definition of "transient water system" in WAC 246-290-020(5)(b)(A), unlike the definition of a municipal water supplier in RCW 90.03.015(4), expressly allows the twenty-five or more people to be "different people" during the sixty or more days. Examples of the transient system include a motel and restaurant, but no other businesses. Crown West emphasizes WAC 246-290-020(5)'s definition of the transient water system because the nonresidential population may differ from day to day and the examples include a motel.

The purposes behind the definitions found in the Department of Health regulations and those found in RCW 90.03.015(4) differ. The Washington State Department of Health safeguards, under the federal Safe Drinking Water Act, the purity of drinking water for purposes of public health. The Department of Ecology, who administers

45

implementation of RCW 90.03.015(4), also holds responsibilities for clean water, but under the federal Clean Water Act and in a broader sense concerning the environmental condition of the state's natural waterways. WAC 246-290-020(5) applies only to public water systems, and Crown West owns a private water system. Since the Department of Health regulations further dissimilar ends, we afford WAC 246-290-020(5) little import.

The Department of Ecology contends that "'residential use of water for a nonresidential population'" implies use by people who reside elsewhere. RCW 90.03.015(4)(a). In turn, Ecology inserts into its POL-2030 the term "temporary domicile" to characterize the concept of a "nonresidential population." AR at 146. According to Ecology, residential uses must serve temporary domiciles occupied by the same nonresidents overnight for sixty or more days each. According to Ecology, Crown West does not fulfill the standard with a hotel by aggregating populations of different transients who may stay overnight for only a few days each. Ecology limits its examples of facilities to vacation homes and farm worker housing. Our construction of the second statutory definition partially coincides with Ecology, but we need not formally adopt the policy statement or limit examples to vacation homes and farm worker housing.

Crown West astutely argues that an industrial park is more worthy of the relinquishment exemption than vacation homes and thus more worthy of being deemed a municipal water supplier. Presumably, Crown West emphasizes the jobs available at the industrial park that stimulate the Spokane Valley economy. We are not convinced that a

business and industrial park deserves more protection for its water system than a system serving temporary housing. Anyway, the legislature should make this determination.

Streamlined Process

The Washington State Department of Ecology maintains a streamlined process to determine the extent and validity of a water right, including whether the right holder qualifies as a municipal water supplier. Crown West underscores Ecology's position that a water right can lose its municipal status if five years pass without the water having been used for that purpose. Crown West argues that Ecology's position conflicts with this process. We need not address this argument since we have not adopted Ecology's position.

Intertie with Consolidated Irrigation District

Finally, Crown West contends that its usage of water also meets the definition in subsection (c) of RCW 90.03.015(4) relating to water supplied indirectly to a public water system. Crown West agreed with Consolidated Irrigation District #19, a government entity, to supply, on an emergency basis, water for municipal purposes. The irrigation district and Crown West fashioned an intertie between the two water systems. The record shows, however, that Crown West has never supplied water to the irrigation district. The two parties exchange minimal amounts of water periodically only to ensure the proper functioning of the intertie's valves.

The relevant portion of RCW 90.03.015 declares:

> (4) "Municipal water supply purposes" *means a beneficial use of water:* . . . (b) for governmental or governmental proprietary purposes by a city, town, public utility district, county, sewer district, or water district; or (c) indirectly for the purposes in (a) or (b) of this subsection through the delivery of treated or raw water to a public water system for such use.

(Emphasis added.) We reject Crown West's contention. The statutory language assumes that the water supplier actually delivers water to the public water system and the public water system puts the water to a beneficial use. If we read the statute otherwise, a private water supplier could enter an agreement to provide water to the public system and construct the intertie solely for the purpose of immunizing its water right from relinquishment.

## CONCLUSION

We affirm the Pollution Control Hearings Board's decision with regard to Crown West's applications for a change and transfer of use.

_____
Fearing, J.

WE CONCUR:

_____     _____
Korsmo, J.                                   Siddoway, J.